**Gary F. TAYLOR, et al., Plaintiffs,**

v.

**DOOR TO DOOR TRANSPORTATION SERVICES, INC., Defendant.**

**No. C–1–88–331.**

United States District Court, S.D. Ohio, W.D.

June 15, 1988.

Anthony G. Covatta, Harry J. Finke, IV, Elizabeth A. Horwitz, Cincinnati, Ohio, for plaintiffs.

Russell A. Kelm, Daniel R. Swetnam, Columbus, Ohio, Richard D. Heiser, Larry A. Temin, Cincinnati, Ohio, for defendant.

## ORDER

HERMAN J. WEBER, District Judge.

This action was commenced on April 11, 1988 by five shareholders of Door to Door Transportation Services, Inc. against the company, Norman Traeger (a shareholder and director of the company), DTD Investment Associates (a shareholder of the company) and Ronald Dillard (a director of the company). The Complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Also alleged are state law claims of breach of fiduciary duty, conflict of interest, fraudulent inducement and breach of contract.

Upon plaintiffs' withdrawal of the request for a temporary restraining order, a hearing was set for April 19, 1988 on plaintiffs' request for a preliminary injunction which was consolidated with the trial on the merits of the federal claims under Rule 65(b), Fed.R.Civ.P. The federal claims that were tried to the Court over four (4) days are contained in the First Claim of the Complaint and involve a stock sale on November 23, 1987 between plaintiffs Gary

and Janice Taylor and defendant Norman Traeger.

The claims are that Traeger obtained stock from the Taylors on November 23, 1987 that gave him majority control of the company, through misrepresentations of material facts in violation of Rule 10b-5. These included claims that Traeger had an undisclosed plan to fire Gary Taylor and Marita Wellage Reiley, both members of senior management. Additionally, plaintiffs claim that Traeger failed to disclose he was the only investor in DTD Investment Associates, an Ohio limited partnership, and that there were no other outside investors.

This matter was tried to the Court on April 19, 20, 25 and 26, 1988. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court does submit herewith its Findings of Fact and Conclusions of Law.

### Findings of Fact

Door To Door Transportation Services, Inc., ("Company") commenced operation in June, 1985. It was controlled by plaintiffs, Gary Taylor ("Taylor") and his wife, Janice Taylor. Taylor's education and experience was in the urban transportation business. This particular company reflected a new and unique concept of urban transport. The original idea for the Company was to provide ground transport among nearby cities and airport transport. It later provided package delivery and transportation of the handicapped within the city.

The Company was originally capitalized with a $275,000.00 Small Business Administration guaranteed loan, the Taylors' savings and money from friends and relatives. They continued to obtain capital from family and friends who invested in the Company. Marita Wellage Reilly ("Reilly") was an investor, who, along with Mr. Taylor, had an extensive background in the field of transportation and had worked with Taylor at another large transportation company. She became Chief Operating Officer and Vice–President of the Company.

From the beginning, the management of the Company was unable to realistically track or predict the income and capital needs of the Company. One reason advanced for this problem was that the Company was providing a service heretofore unknown and untried. As time went on, even with experience, the management did not become any more adept at these important management functions.

By January, 1986, the Company was looking for outside investors. They had initial discussions with the Cincinnati Investment Fund and two other investment companies. By March 25, 1986, they had developed a deal with Cincinnati Investment Fund.

Prior to this time, however, Reilly had been contacted by defendant Norman Traeger ("Traeger") who said that he had read about the company in the newspaper and, being a venture capitalist, was interested in new businesses in growth areas. She referred him to Taylor, who had initial discussions with him. When made aware of the Cincinnati Investment Fund proposal, Traeger requested an opportunity to develop a better proposal. Taylor and Reilly dealt with Traeger because they believed he would not interfere with their vision of the Company. Taylor and Reilly believed there were other investors involved with Traeger at this time but never inquired of Traeger if, in fact, there were or who they were.

On June 3, 1986, the Company signed an agreement with DTD Investment Associates ("DTD"), a limited partnership, which was formed by Traeger around this time for the purpose of investing in the Company and obtaining outside investors. DTD purchased 30% of the stock in the Company and the Company received $600,000.00, $573,000 to be loaned as needed from time to time which provided a line of credit and $28,000.00 for the stock. The sole general partner of DTD was DTD Investments, Inc., a corporation which was 100% owned by Traeger who was its president. The sole limited partner of DTD was Traeger himself. The partnership documents filed publicly reflected the fact that Traeger was president of the general partnership and the sole limited partner in DTD Associates. In addition to DTD, Traeger owned at least

five other companies and operated them under the name of The Discovery Group, Inc. His partner in this group was Ron Dillard, another named defendant.

It was contemplated by the June, 1986 agreements with Door to Door that Traeger would solicit other investors to join DTD, the limited partnership. Throughout 1986, Traeger contacted potential investors and eventually sold five units of the limited partnership, three (3) units to family members and two (2) units to outsiders. Traeger was unable to obtain additional investors in the limited partnership because the Company consistently failed to have a single profitable month.

Although the Company had projected it would need only $447,000 of the $600,000 to become profitable by March, 1987, it continued to have money problems. By the November, 1986, Board of Directors meeting, the Company had depleted the total amount of credit agreed to in June, 1986. At this time, Traeger began seeking a cost reduction program. Taylor continually failed to accurately project future earnings, the amount needed for working capital or develop a workable cost reduction plan. The capital of the Company was depleted again and again; therefore, it signed various notes and agreements with Traeger to obtain more and more money. By June, 1987, the Company became obligated to pay interest and penalties on the earlier notes, adding to its financial woes. Because of its continued financial problems, the Company was significantly restricted to dealing with Traeger for its financing. The Company blamed its accounting system for its failings.

To protect the original investment, Traeger personally made additional investments in the company in June, 1987 and in August, 1987. These investments were accompanied by extensive written agreements. Because the Company's profit predictions were not satisfied, increasingly stringent controls and incentives were included in the agreements. By August, 1987, the agreements allowed Traeger to obtain 75% of the issued and outstanding stock of the company if the company required any additional financing (except for two minor specified purposes) or if profit projections were not met.

From its inception until April, 1987, a company employee collected and organized the financial data and sent it to an outside accounting firm for analysis and computations. By April, Traeger encouraged the Company to dispense with these services in an effort to save the fees paid out to the outside accounting firm. Traeger's partner, Dillard, who had an extensive background in accounting, came to the Company, installed a computer system, and began to personally oversee the accounting system of the Company.

Dillard was the only person working with the Company's financial statements during May and June. In July, 1987, Melody Hofman was hired by Reilly and Taylor as an accountant to be in charge of the accounting system of the Company. At the outset, Hofman found the financial records in total disarray. No financial statement had been prepared since May, 1987. She worked with Taylor and considered him her boss. She considered Dillard her accountant advisor and sent him all of the bills and receipts to check her calculations after she had worked her way through them.

Dillard did not, however, work on Company premises after August, 1987. By November 15, 1987, Hofman had organized complete financial statements for the preceding months of June through October. She submitted all final statements to Taylor who was in the habit of working on them with her.

By the fall of 1987, Traeger and Dillard had become more and more involved with the Company. By August, Traeger's own approach to his investments had changed. Both Traeger and Dillard had been shocked by Dillard's findings regarding the true financial condition of the Company. Traeger warned Taylor that his focus had to be on positive cash flow. Comments were made to employees suggesting even more involvement by Traeger and his associates in the future.

By November, 1987, the Company was in default on all its earlier loans. Traeger

informed the Company's management that he would not be able to obtain any more money for the Company without gaining majority control of the company's stock. For several weeks, Taylor and Traeger negotiated the terms under which Traeger could do so. Of special concern to all was the employment contract Taylor would sign. Reilly and other minority shareholders considered it a prerequisite to their waiver of any rights with regard to their stock options. Several drafts were reviewed and amended by Taylor, Traeger, Dillard and Reilly. During a telephone call during the last seven to 10 days prior to the closing of the transaction, Traeger assured Taylor that under the new arrangement, the Company would get all the money it needed and Taylor could stay in control of the day-to-day operation of the Company. This satisfied all concerned.

On November 23, 1987, the closing took place. The terms of the agreement required Taylor and his wife to sell 65 shares of stock to Traeger for $1.00 per share, which gave Traeger bare majority control of the Company, not the 75% control to which he was entitled, required Taylor's wife and Reilly to resign from the Company board of directors and Reilly and the other minority shareholders to waive their right of first refusal to purchase the 65 shares of Taylors' stock. The Board of Directors became Taylor, Traeger and Dillard. Taylor entered into the Employment Contract. A Mutual Release was executed releasing the Taylors from most of their personal obligations and Traeger from his right to obtain 75% of the Company's stock. Two replacement Term Notes were executed whereby the Company promised repayment of funds advanced by the Taylors and by Gary Taylor's parents. The parents were to be repaid the sum of $27,500 used to open the business plus interest due and payable by May 31, 1988. The Company received $84,000 from Traeger at the closing for Company use.

The Employment Contract was for a term to end May 31, 1990. The contract contained projected earnings for each fiscal year and designated Taylor's failure to attain these numbers as just cause for termi-nating his employment. The performance standard for the fiscal year ending May 31, 1988 was that the Company realize profit before taxes of $130,000. The Employment Contract conferred on Taylor day-to-day control of all aspects of the operation of DTD including hiring, firing and compensating all employees except for the selection and supervision of the Chief Financial Officer.

In a separate letter of the same date, Traeger represented that The Discovery Group, Inc. would fund the cash flow requirements of the Company through February 9, 1988, not to exceed $80,000. This committment was not set forth as specific consideration in the written agreements for the purchase of the 65 shares of stock.

On December 2, 1987, a luncheon was attended by the management team and Traeger. Traeger reiterated his intention to obtain the money necessary to keep the Company running and reaffirmed his faith in the present management. All, including Reilly, expected him to fund the goals they had all agreed upon. When one of the management team asked Traeger at the luncheon if there would be funds for new vans, the person was told to go to Taylor who could recommend it. Traeger expressed his intention that the Company be the best, which, to him, meant the most profitable of its kind. In December, the Company received another $30,000.00 from Traeger.

Greg Collier was hired by Traeger and began with the Company during the first week of December, 1987. He was hired to analyze the financial status of the Company and answer to Taylor. He sent copies of all financial statements to Traeger. By January, 1988, Collier had taken most of Hofman's work away from her.

In January, 1988, Traeger began to realize that under Taylor's management, operating costs would not be controlled or reduced, even though Taylor had outstanding ability to generate gross sales. Therefore, Traeger became increasingly present at and involved in the Company. Traeger was physically present several days a week,

interviewed employees concerning their responsibilities, and asked specific details of the operation and their suggestions for improvement. He directed the preparation of time and route studies and went on the route with drivers. He asked several employees what difference a management change would mean. This increased involvement led to great hostility and resentment at the Company. By the second week of February, 1988, one of the Company's employees was concerned enough to call a meeting of the management team to make all of them aware of his belief that Traeger intended to take over management of the Company.

In March, 1988, Traeger and Dillard asked more specific questions about scheduling and expressed their intention and desire to reduce operating costs. From these comments, Reilly inferred an intention to take over the Company. Reilly consulted an attorney about her concerns. The attorney drafted a letter to Traeger on March 18, 1988.

By February, 1988, Traeger considered for the first time that Taylor should be discharged.

As it was obvious that the performance standard set forth in Taylor's Employment Contract would never be met, Traeger planned to follow the terms of the contract and terminate Taylor after May 31, 1988. As the hostility increased, Traeger was increasingly shut out at the Company even though he was the majority shareholder and director of the Company. Taylor suggested that a minority stockholder "lawsuit was brewing," whereupon Traeger decided to move up his time schedule from May 31, 1988. He believed he must take immediate action to avoid losing control of the Company and his investment.

In late February or early March, 1983, Traeger called Robert Richards, whom he had interviewed for a management position the summer before. They met and reviewed the financial statements and possible management plans for the Company. Traeger initially offered Richards a consulting job, telling Richards he would be paid by Sonic Corp., but offered Richards the presidency of the Company after deciding to terminate Taylor. Richards received an Employment Contract for that position on March 28, 1988.

The Company's Board Meeting, held on April 4, 1988 lasted 45 seconds. Taylor opened the meeting, Traeger interrupted, offered two resolutions, Dillard seconded the motions and as a result, Reilly and Taylor were terminated.

Since November 23, 1987, until the time of trial, Traeger has advanced the Company, the sum of $344,000.00. In addition, he guaranteed a letter of credit in the amount of $65,000.00 to secure a performance bond for a major contract of the Company. Further, DTD Investments, Inc. has purchased four vans, at a total cost of $104,016.00 and leased them to the Company.

### Conclusions of Law

Plaintiffs' federal claims for relief arise out of the November 23rd transactions including the sale of the stock by Gary and Janice Taylor to Norman Traeger and the agreements affecting other shareholders' rights. In connection with that transaction, plaintiffs claim that there were misrepresentations of material fact in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Rule 10b–5 provides as follows:

It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

a) to employ any device, scheme or artifice to defraud,

b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or

c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

The Court has jurisdiction over this matter. The telephone, telecopier and mails were used in connection with the November 23, 1987 transaction thereby fulfilling the jurisdictional requirement of "use of any means or instrumentality of interstate commerce" contained in 10b–5. *Mansbach v. Prescott, Ball and Turben,* 598 F.2d 1017 (6th Cir.1979).

Plaintiffs claim that defendant Traeger made misrepresentations of material facts to plaintiffs in connection with the November 23rd stock transactions. They claim that the misrepresented facts include: 1) Traeger's promise to supply the necessary funding to assure the continued growth of the Company intending to loan funds only to the extent that he wanted to and on his terms, 2) Traeger's assurances to plaintiffs Taylor and Reilly that he was very satisfied with existing management of the Company, 3) Traeger's verbal assurances to Taylor that the performance standards in the Employment Agreement would not be strictly enforced, and 4) Traeger's representation that his outside investors would not allow him to loan any more money to the Company unless Traeger acquired a controlling interest therein.

Plaintiffs further claim that defendant Traeger misrepresented facts by omitting to state material facts in connection with the stock transaction. The facts which Traeger allegedly failed to disclose included 1) his present dissatisfaction with existing management and his intention to replace existing management, 2) his change in his overall investment policy from a venture capitalist to investing for his own account, 3) his more detailed knowledge of the financial results and conditions of the Company in November, 1987 resulting from his having taken control of the financial accounting system in April, 1987 and 4) Traeger's intention to control the Company by controlling the accounting department.

Plaintiffs must establish the facts by a preponderance of the evidence, the required burden of proof in this case. *Her-*

*man and MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The proof of securities violations may include circumstantial evidence as well as direct evidence. *SEC v. Coffey,* 493 F.2d 1304, 1317 (6th Cir.1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

Misrepresentations of facts pertaining to promises of cash and employment are actionable under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. *Wilsmann v. Upjohn Co.,* 775 F.2d 713 (6th Cir.1985). The failure to disclose an intention to oust plaintiff from the corporation in connection with the sale of securities is actionable under § 10(b) and Rule 10b–5. *Brown v. Ivie,* 661 F.2d 62 (5th Cir.1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982).

To recover on this claim, plaintiffs must prove 1) that defendants used the mails or an instrumentality of interstate commerce or a facility of a national securities exchange in connection with the purchase of stock in Door to Door, 2) that defendants misrepresented facts, either by commission or omission to plaintiffs, 3) that the misrepresentations were material, 4) that the misrepresentations were made in connection with the purchase of the stock, 5) that defendants acted with scienter, 6) that plaintiffs reasonably relied on the misrepresentations and 7) that plaintiffs were injured. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Scienter is a necessary element of a violation of § 10(b) and Rule 10b–5, regardless of the identity of the plaintiff or the nature of the relief sought. *Aaron v. SEC Commission,* 446 U.S. 680, 693, 100 S.Ct. 1945, 1953–54, 64 L.Ed.2d 611 (1980); *Herman and MacLean, supra; Ernst & Ernst, supra* The term scienter refers to a mental state embracing intent to deceive, manipulate or defraud. *Mansbach, supra.* In order to prevail on their claims, it is plaintiff's burden to show by a preponderance of the credible evidence that misrepresentations were made with the intent to mislead

the plaintiffs in connection with their sale of stock and waiver of first refusal. *Ketchum v. Green*, 557 F.2d 1022, 1026–29 (3d Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977).

■ After hearing, considering and balancing the credibility of all the testimony and evidence presented at the four-day trial, the Court concludes that the credible evidence dictates a finding that defendant Traeger did not, in negotiating and consummating the November transactions, act with the requisite intent to deceive, manipulate or defraud the plaintiffs. Therefore, there is no violation of § 10(b) and Rule 10b–5.

As the judge of credibility in this case, the Court finds that the only reasonable interpretation of the events of November, in fact, the only possible conclusion which can be drawn from the evidence, is contrary to the version plaintiffs espouse. The Court was particularly attentative to and critical of defendant Traeger's testimony since the proof of his intent to deceive plaintiffs was determinative of the case. The Court found Traeger a credible witness and believes that in November, 1987, he wanted the existing management to succeed and did not desire, intend or plan to discharge Taylor until February, 1988. It is simply not credible that Traeger would secretly harbor plans to discharge Taylor yet not take advantage of the right he already had under prior agreements entered into before November, 1987, to take over 75% control of the Company, then sign a three-year employment contract with Taylor and release his rights under prior agreements, especially when, under plaintiff's theory, he had Taylor's eventual replacement waiting in the wings prior to the November negotiations.

Secondly, there was overwhelming evidence that plaintiff Taylor had day-to-day control of the Company. Despite statements made to employees by "Traeger's people," there was no actual movement to displace Taylor or interfere with his authority at any time prior to his discharge in April, 1988. While "Traeger's people" installed computer programs, Taylor worked

on all the financial statements with his accountant and received copies of all the completed monthly reports. Further, although Traeger investigated and interviewed employees, there was no evidence of any actual changes he made other than those provided for in the Contract. All employees, including Greg Collier, hired in December, 1987 were instructed to answer to Taylor and all direct requests of Traeger were directed to Taylor for approval. The credible evidence is that, prior to January, Traeger was continually attempting to use his experience in business matters to advise Taylor without any consideration of the possibility of replacing him.

Having failed to prove the requisite scienter, plaintiffs have failed to prove a necessary element of a violation of § 10(b) and Rule 10b–5.

■ As to plaintiffs' claim that Traeger mislead plaintiffs by his lack of significant, outside investors, it is irrelevant to the federal claim because the only investment in the Company by DTD Investment Associates, Inc. was in June of 1986. All other investments after that date were made either by Traeger personally or were leases held by DTD Investments, Inc. of which Traeger was the president and sole shareholder. DTD's investment in June, 1986 is certainly not "in connection with" the sale of stock to Traeger in November, 1987.

> "While the 'in connection with' requirement of Section 10b is to be construed flexibly rather than technically or restrictively ... some discernible nexis between the allegedly fraudulent conduct and the purchase of securities is required."

*See Ketchum, supra.*

■ As to the claims that Traeger misrepresented that defendants intended to provide all additional cash that was necessary to assure the continued existence of DTD in the foreseeable future and that the performance standards set up in the agreement would not be strictly enforced, it is well settled that promises are not actionable unless plaintiffs prove that, at the time the promises were made, defendant had no intention to perform them. *Coal Resources v. Gulf & Western Industries,*

*Inc.*, 756 F.2d 443, 446 (6th Cir.1985). Further, plaintiffs are not entitled to show through extrinsic evidence that defendant had no intention, at the time the contract was entered into, of performing promises which are not contained in the written agreement because the written contract contained an integration clause. *Coal Resources* at 446. The purpose of an integration clause is to preclude reliance upon promises of future performance that have not been included in the contract. *Id.* at 447 n. 2.

The agreements entered into in November of 1987 made no mention of any obligation of defendant Traeger to supply any additional funds. They did contain standards of performance by which Taylor agreed to be bound.

The Court notes that a letter dated the same day, November 23, 1987, shows defendant's intention to supply funds not to exceed $80,000. The Company received $84,000 on the date of the transaction and has received many times that since November. Traeger fulfilled any real or imagined obligation to supply funds to the Company.

The unfortunate scenario which unfolded during the trial involved two groups who had become inextricably and unwillingly bound to each other over the course of several years. Plaintiffs had a dream which needed money to operate, but wanted no interference in its operation; defendant had money to invest but demanded a return on that money. After some time, plaintiffs could not go elsewhere for funding because no one else would invest until the Company showed profits. Defendant had invested too much to pull out. Plaintiffs unrealistically and naively believed that they could revolt against the only source of capital they had and win. Plaintiffs, however, have failed to prove the elements of their federal claim.

Having found no violation of 10b–5 the Court need proceed no further, however, it feels compelled to note that the relief sought by plaintiffs is the rescission of all the November transactions and all subsequent transactions. Rescission of a sale is appropriate to unravel transactions affected through violations of Rule 10b–5 to the extent that it may be done fairly and without injuring the rights of innocent parties. *Wright v. Heizer Corp.*, 560 F.2d 236, 252 (7th Cir.1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978). The Court does not believe that rescission could have been effected fairly and without injuring the rights of innocent parties, particularly Mr. Taylor's parents, who now have a reasonable expectation of receiving repayment of the funds they advanced to their son's company, whereas, before there existed a strong possibility that their funds would be lost.

### Conclusion

As the Court found no violation of Section 10(b) of the Securities Exchange Act, plaintiffs' request for a preliminary injunction is DENIED.

Defendants' counterclaims filed on the day before trial were not filed with leave of Court and accordingly, their filing was not in conformity with Fed.R.Civ.P. 15(a).

Defendant's Motion to Dismiss Plaintiffs' Pendent State Law Claims (doc. no. 6) is hereby GRANTED WITHOUT PREJUDICE. *Thompson v. Midwest Foundation Independent Physicians Association*, 117 F.R.D. 108, 114–15 (S.D.Ohio, 1987); *Goff v. Kroger Co.*, 647 F.Supp. 87, 88 (S.D.Ohio 1986); *Foltzer v. Lodge & Shipley Co.*, 636 F.Supp. 843, 844 (S.D.Ohio, 1986).

The Clerk is hereby ORDERED to enter judgment in favor of defendant on the federal claim with prejudice; the state claims are hereby DISMISSED WITHOUT PREJUDICE; the counterclaims are DISMISSED WITHOUT PREJUDICE and this case is hereby TERMINATED.

IT IS SO ORDERED.