[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION AND JUDGMENT ENTRY
This case is before the court on appeal from several judgments of the Erie County Court of Common Pleas. Appellants/cross-appellees, The BOC Group, Inc., d.b.a. Ohmeda, et al., ("BOC"), appeal the trial court's denial of BOC's motions for: (1) partial summary judgment; (2) a directed verdict on appellee/cross-appellant's claims of promissory estoppel and breach of contract; (3) a judgment notwithstanding the verdict; and (4) new trial and remittitur. BOC also appeals from the final judgment awarding $2.9 million to appellee/cross-appellant, O.E. Meyer Company, formerly known as O.E. Meyer Son ("Meyer"). Meyer appeals the trial court's grant of a directed verdict on their claims of fraud and fraudulent concealment and the denial of their motions for prejudgment interest and merger of interest and damages.
BOC's first assignment of error reads as follows:
 "THE TRIAL COURT ERRED IN DENYING BOC'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT, DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT ON THE CLAIMS FOR PROMISSORY ESTOPPEL AND BREACH OF CONTRACT."
Upon a thorough review of the record of this case, we must conclude that the trial court erred in failing to grant BOC's motion for summary judgment on Meyer's promissory estoppel claim and the breach of the oximeter contract. However, because we have the same opinion after reviewing all of the evidence offered at trial, we shall address BOC's first assignment of error as it relates to the motion for a directed verdict and for a judgment notwithstanding the verdict.
The standard to be applied in considering a motion for a directed verdict is the same standard to be applied in considering a motion for judgment notwithstanding the verdict. See Gladon v.Greater Cleveland Regional Transit Auth. (1996), 75 Ohio St.3d 312,318-319, citing Posin v. A.B.C. Motor Court Hotel, Inc.
(1976), 45 Ohio St.2d 271, 275.
Civ.R. 50(A)(4) provides:
 "* * * When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
If there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. Wagner v. Roche Lab. (1996), 77 Ohio St.3d 116, 119-120. We cannot weigh the evidence or judge the credibility of the witnesses. Sanek v. Duracote Corp. (1989), 43 Ohio St.3d 169,172.
The following dispositive facts are taken from the pleadings, testimony offered at the trial of this matter and numerous exhibits admitted into evidence.
BOC is a large international corporation that engages in the manufacture and sale of industrial gases and health care products and services. In addition to direct sales, BOC or one of its divisions entered into contracts with distributors for the sale of medical products in the United States. As of 1984, BOC had contracts with an estimated five hundred to six hundred distributors in this country.
During the time period, approximately 1980 to 1987, relevant to this case, Ohmeda, an unincorporated division of BOC, was involved with the sale and service of medical products in the state of Ohio. Meyer, an Ohio corporation, had a long business relationship with BOC. This relationship was evidenced by a series of contracts between Meyer and Ohmeda. In 1980, Meyer and Ohmeda executed a contract that permitted Meyer to distribute,i.e., sell, specified BOC medical products in northern Ohio. The contract, captioned "AUTHORIZED OHIO DEALER AGREEMENT," contains the following pertinent provisions:
 "1. Ohio [Ohmeda] hereby appoints Dealer [Meyer] as a non-exclusive distributor in Dealer's primary area of marketing responsibility * * *.
"* * *
 "5. The term of this agreement shall commence on 11-1-80
and subject to its earlier termination under this Agreement will continue in effect for a period of one (1) year and thereafter from year to year unless terminated earlier under this Agreement.
"* * *
 "14. (a) Dealer or Ohio may terminate this Agreement in its entirety, with or without cause, upon giving to the other at least thirty (30) days prior written notice.
"* * *
 "16. The provisions of this Agreement, including the attached Schedules, constitute the entire agreement between Ohio and the Dealer relating to matters covered by the agreement.
"* * *
 "19. This Agreement shall become valid on being signed by Ohio's Manager of Dealer Sales and by a duly authorized officer of the Dealer. No modification or waiver of any of its provisions shall be binding upon Ohio unless set forth in writing and accepted by Ohio's Manager of Dealer Sales."
In the early 1980's, advances in technology and an increasing need for technical services affected the manner in which BOC's medical products division marketed its goods. In 1984, the Ohmeda division actually lost money. At that point, either in 1983 or 1984, BOC hired a consulting firm to conduct a study of its entire operation in order to determine the best method in which to improve profitability. One of the recommendations made by the firm was to eliminate distributors and focus on direct sales and service. Consequently, in November 1984, BOC terminated, without cause, the contracts of approximately four hundred to five hundred distributors in the United States. Meyer was one of the ninety-seven distributors that was retained.
On September 27, 1985, BOC terminated all but six of its distributors in the United States. Meyer remained a distributor. Furthermore, a contract to sell the BOC oximeter line was offered to Meyer. In addition, Meyer's territory was extended to all of Ohio, except Cincinnati, and they were allowed to sell the BOC 8000 anesthesia machine. However, the recommendation of the consulting firm was that Meyer be classified as a "short-term" distributor for less than one year pending the development of an effective direct sales and service force in the state of Ohio. Paul A. Baumgart, Manager of National Account Development for Ohmeda, testified that BOC decided to retain Meyer as a distributor and re-evaluate the situation in Ohio at a later time.
During 1984 and 1985, Meyer sought assurances from BOC of a "long term commitment" to their business relationship. Baumgart admitted that BOC knew the offering of the oximeter line, the new anesthesia machine and the expansion of its territory would be viewed by Meyer as signs of commitment. According to David G. Belden, General Manager of Meyer's medical division, he was assured, through words and conduct, that Ohmeda was committed to Meyer. He testified that after the September 1985 terminations, Baumgart told him that Meyer made the "final cuts." Baumgart testified that he told Meyer that they made the "cut." David Belden also said that Baumgart stated that the relationship with Meyer was a "long term commitment." As of early fall 1985, David Belden believed that BOC and Meyer were in a "two-sided, long term" relationship.
Nevertheless, at a meeting in October 1985, David Belden learned that of the six remaining distributors in the United States, those in the South had a different dealer's contract. According to Christopher S. Heppel, Vice-President of Medical Sales at Mid-South Oxygen Company during the relevant period, the terms of this contract named the dealer the "sole distributor" of BOC medical products in its territory. Additionally, the dealer could not be terminated without cause absent twenty-four months prior notice.
On October 16, 1985, David Belden sent a letter to Baumgart that stated, in material part:
 "At this time Paul, we find it essential to update our contractual relationship and enter an agreement as you have done with your dealers in the South. We have many investments in people, products and promotions to make. These are not minor, but major investments, all of which center on the total committment [sic] to market Ohmeda, but which must be protected by more than a mere thirty day termination clause. * * * If your committments [sic], as you have stated, are reflective of your intentions, I'm confident you will solidify this arrangement with a new contract to provide the stability and security vital for success."
Baumgart did not respond to David Belden's letter. Therefore, on November 20, 1985, he wrote another letter to Baumgart and attached the October 16, 1985 letter. David Belden wrote:
 "We have put all our eggs in your basket with our exclusive committment [sic] to market Ohmeda products. The future of our company in the medical field is my responsibility and we need assurances as to our future with you. * * * We are asking for a long term committment [sic] from Ohmeda regarding our dealership. No relationship will last and prosper, whether personal or business, without equal committments [sic] from the partners. You are aware of our loyalties, and your decision to maintain our dealership shows your recognition of our position in Ohio. Let's put the relationship in writing so we can both concentrate our total resources on serving the needs of our customers. I believe you have the confidence necessary, after meeting our people and understanding what O.E. Meyer represents, to enter such an arrangement and I'm optimistic that you realize the total benefits we can offer we can offer Ohmeda and its shareholders. Thank you for your consideration!!"
On January 17, 1986, Baumgart responded to David Belden's letters. In his letter, Baumgart recognized the degree of commitment Meyer made to Ohmeda. He further acknowledged that BOC's desire to continue the relationship and the expansion of Meyer's role in the sale of BOC's products in Ohio were signs of Ohmeda's commitment to Meyer. Nonetheless, he expressly stated:
 "We believe our present agreement has served both of our companies well and clearly defines the basis on which our non-exclusive distributor agreement exists. It is on this same basis that we would like to continue our relationship. * * * I'm sorry that we are unable to give you the kind of explicit commitment you are asking for. But again, we feel our present agreement has served us well and so we would like to maintain that contractual relationship."
Apparently, after receiving this letter, David Belden dropped the subject of a new contract.
On July 18, 1986, Meyer entered into a dealer's agreement made retroactive to February 1, 1986, for the distribution of the BOC oximeter line. The terms of the non-exclusive one year contract are very similar to those found in the Authorized Dealer's Agreement and can be terminated, without cause, upon thirty days written notice. The agreement contains an integration clause, but it does not state that any modifications thereto must be in writing.
At a meeting in the fall of 1986, Rodney Belden, President of Meyer, talked with Desmond O'Connell, a Managing Director of BOC, concerning the terms of their express contracts. Rodney Belden testified that he told O'Connell that he felt "that the agreement we had and the relationships that we had with BOC would be adequate to carry us forward." However, he did express a hope that Meyer could obtain a twenty-four month notice of termination agreement. O'Connell made no promises. At the same meeting, Rodney Belden expressed his dissatisfaction with the agreements to another BOC executive. When asked whether he knew that his company was operating under an agreement with a thirty day notice of termination without cause provision, he repled, "We never questioned that, sir."
On January 14, 1987, BOC hand delivered a notice of termination of both the 1980 Authorized Dealer's Agreement and the 1986 contract for the sale of oximeters. Pursuant to the notice, the terminations were effective as of July 1, 1987. Meyer filed its complaint on August 14, 1987 seeking injunctive relief (later withdrawn) and damages based on alleged violations of the Valentine Act, R.C. Chapter 1331; breach of contract(s); promissory estoppel; tortious interference with business relationships and fraud. A first amended complaint, filed after BOC's motion for summary judgment but long before the trial court's decision on that motion, added a conspiracy claim, a second fraud claim relating to actions taken by BOC after the notice of termination of the dealer's agreement, a fraudulent concealment claim and a claim for failure to exercise good faith. Additional defendants were also named in the first amended complaint[1].
BOC's motion for summary judgment asserted that no set of facts could be offered to demonstrate: (1) a violation of the Valentine Act; (2) a breach of the distributor contracts; and (3) a definite promise of a "long term commitment" that would vitiate the express terms of the distributor agreements and/or that Meyer's reliance on such a promise, if any, was reasonable. Because the Authorized Dealer's Agreement specified that New York law governed that contract and the oximeter agreement stated that Colorado law was applicable to that contract, BOC contended the trial court should employ the substantive law of either of those jurisdictions in making its decision. BOC apparently abandoned its choice of law arguments. That is, our review of trial briefs, the court's jury instructions, post-trial motions and appellate briefs reveals that the parties subsequently relied solely on Ohio law, as well as some federal cases.
Meyer's memorandum in opposition to BOC's motion for summary judgment argued that Ohio law was applicable to this case. However, Meyer also cited to New York law in asserting an oral modification of the written contracts and that questions of fact existed as to the elements of promissory estoppel. Both parties filed reply memoranda and, in 1988, Meyer filed a second amended complaint. No further action was taken in this case until 1997. At that time, the trial court denied the motion for partial summary judgment, finding genuine issues of material fact.
In March 1998, Meyer filed a third amended complaint basing its case upon two alleged violations of the Valentine Act, fraud, fraudulent concealment, promissory estoppel, breach of contracts, tortious interference with business relationships and bad faith. Meyer also asked for punitive damages. The case then proceeded to trial. BOC first requested a directed verdict after opening arguments; the court below denied that request. At the close of its case in chief, BOC renewed its motion for a directed verdict on all claims. The court granted that request on all claims except promissory estoppel and breach of the contract granting Meyer the right to sell the oximeter line. After the trial court entered its judgment, BOC filed a timely motion for, among other things, a judgment notwithstanding the verdict on the remaining claims. The motion was denied.
We turn first to the claim alleging a breach of the oximeter agreement. Meyer apparently concedes that there was no breach of the terms of this agreement. We agree. A court's primary objective in the construction of any written agreement is to ascertain and give effect to the intent of the parties by examining the language that they chose to employ. Foster WheelerEnviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.
(1997), 78 Ohio St.3d 353, 361. The interpretation of a written agreement is, in the first instance, a matter of law for the court. If it is clear and unambiguous, the court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties. Aultman Hosp. Assn. v. CommunityMut. Ins. Co. (1989), 46 Ohio St.3d 51, 53. The plain and unambiguous language of the contract allows termination of the contract without cause upon the giving of thirty days notice. Meyer was afforded far more time than thirty days notice of the termination.
Next, we consider the promissory estoppel claim as it relates to the Authorized Dealer's Agreement. BOC first argues that when a clear and unambiguous contract exists as to a particular term, in this case termination, a claim of promissory estoppel is unavailable to a plaintiff. Because promissory estoppel is a quasi-contractual or equitable doctrine, see Karnesv. Doctors Hosp. (1990), 51 Ohio St.3d 139, 142, used to impose a promise where there is no contract, see Mers v. Dispatch PrintingCo. (1985), 19 Ohio St.3d 100; Gallant v. Toledo Pub. Schools
(1992), 84 Ohio App.3d 378, we are inclined to accept appellant's argument. In the present case, the trial court determined that there was no oral modification, waiver or removal of the provisions[2] in the Authorized Dealer's Agreement as they related to termination without cause, i.e., the court found that a valid enforceable written contract existed and was not breached. As a result, Meyer could not recover under a theory of promissory estoppel. See Terry Barr Sales Agency, Inc. v. All-Lock Co.
(C.A.6, 1996), 96 F.3d 174; Cloverdale Equip. Co. v. SimonAerials, Inc. (C.A.6, 1989), 869 F.2d 934, 939. See, also,Ballard Assocs., Inc. v. Firestone Tire Rubber Co. (Feb. 15, 1989), Summit App. No. 13713, unreported.
Moreover, BOC correctly asserts that, even in viewing the evidence in a light most favorable to Meyer, substantial probative evidence was not offered on the essential elements of promissory estoppel, which, if believed, would permit reasonable minds to come to different conclusions.
Promissory estoppel is defined as:
 "`A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise * * *.'" Talley v. Teamsters Local No. 377 (1976), 48 Ohio St.2d 142, 146, quoting and adopting Restatement of the Law, Contracts 2d (1973), Section 90.
In order to prove a case of promissory estoppel under Ohio law, a plaintiff must demonstrate the following elements: (1) a promise, clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) such reliance must be reasonable and foreseeable; and (4) the party claiming estoppel must be injured by the reliance. Weiper v. W.A. Hill Assocs. (1995), 104 Ohio App.3d 250,260; Healey v. Republic Powdered Metals, Inc. (1992),85 Ohio App.3d 281, 284.
Here, the promise allegedly made by Paul Baumgart was for a "long term commitment" to the BOC/Meyer relationship. The expansion of Meyer's territory, the oximeter agreement and the agreement (added as a product to the Authorized Dealer's Agreement) to sell the 8000 anesthesia equipment was also alleged as conduct indicating a promise of "commitment." Assuming that these are a clear and unambiguous promise of a continuing relationship, Meyer's reliance, if any, on this promise was not reasonable and foreseeable. The uncontradicted evidence offered at trial established that Meyer knew that thirty day notice termination clauses were common in the industry. As early as 1984, Meyer was aware of possible changes in the manner in which BOC sold its products. Hundreds of distributors were terminated without cause using the thirty day notice of termination provision in 1984. Except for six, the remainder were terminated in the same manner the following year. Meyer then learned that one-half of the remaining dealers had a different written contract allowing for a twenty-four month notice of termination without cause. When Meyer requested a written change in the termination clause of its Authorized Dealer's Contract, BOC unequivocally rejected that request, stating that "our present agreement has served us well." Meyer then acquired the oximeter line only by entering into an agreement with the same terms as the Authorized Dealer's Agreement. The 8000 anesthesia machine was added as a product to the original dealer's agreement. Both David and Rodney Belden acknowledged, that despite their claims of a promise of "long term commitment," they were distributing BOC medical products under an agreement that had a thirty day without cause termination clause. Viewing this undisputed evidence in a light most favorable to Meyer, reasonable minds could not reach differing conclusions as to whether Meyer's reliance, if any, was reasonable and foreseeable. Accordingly the trial court erred in failing to grant BOC's motion for a directed verdict on the claim for promissory estoppel as it involves a promise that purportedly superseded the plain and unambiguous terms of the Authorized Dealer's Agreement.
With regard to the oximeter agreement, Meyer offered no clear and unambiguous promises of long term commitment, either oral or written, after the execution of that contract. Thus, although the trial court instructed the jury on oral modification and or waiver of the terms of that contract, no evidence was offered upon which reasonable minds could reach differing conclusions as to these legal theories. Further, prior oral representations or promises cannot be used to vary the plain and unambiguous terms of a contract, particularly where, as here, the contract contains an integration clause. Wall v. FirelandsRadiology, Inc. (1995), 106 Ohio App.3d 313, citing Lewelling v.Farmers Ins. of Columbus, Inc. (C.A.6, 1989), 879 F.2d 212, 217
(plaintiffs may not rely on the alleged oral representations in the face of district manager's appointment agreement containing integration clause and no mention of alleged promises); Taylor v.Door to Door Transp. Services, Inc. (S.D.Ohio 1988), 691 F. Supp. 27,31 (plaintiff not entitled to show through extrinsic evidence that defendant had no intention at time of contract to perform promises not contained in written contract containing integration clause). Thus, the "long term commitment" promise made prior to the execution of the oximeter agreement cannot be used to contradict the terms of the express, integrated contract.
We are compelled to observe that the parties to this case are experienced businesses which, through their agents, executed numerous contracts over an extensive period of time. Meyer was on notice that BOC and its predecessor in interest retained the right to terminate the contracts at any time. In fact, the contracts provided Meyer with that same option. Although the termination of the contracts may have caused hardship for Meyer, it cannot now portray its business or its agents as the dupes of devious business practices. Meyer was aware of the changes in technology in the medical field and of the modifications in sales practices being made by BOC to meet those changes. Even absent this knowledge, the termination provisions of the contracts are clear and unambiguous and the evidence demonstrated that Meyer fully realized that BOC did not relinquish the right to exercise its right thereunder.
BOC's first assignment of error also raises the issue of Meyer's alleged failure to offer legally sufficient evidence of damages. Because we find that the court should have granted a directed verdict or a judgment notwithstanding the verdict on the merits of Meyer's promissory estoppel and breach of the oximeter contract claims, the issue of damages need not be discussed and is hereby found moot. Those portions of BOC's first assignment of error related to the merits of the two claims decided by the jury are found well-taken. Our disposition of the first assignment of error also renders BOC's second and third assignments of error moot[3].
On cross-appeal, Meyer asserts the following cross-assignments of error:
 "NO. 1: THE COURT ERRED IN GRANTING A DIRECTED VERDICT ON OEM'S [MEYER'S] CLAIM OF FRAUD."
 "NO. 2: THE COURT ERRED IN GRANTING A DIRECTED VERDICT ON OEM'S [MEYER'S] CLAIM OF FRAUDULENT CONCEALMENT."
 "NO. 3: THE TRIAL COURT ERRED IN DENYING OEM'S [MEYER'S] MOTION FOR PREJUDGMENT INTEREST AND DAMAGES."
Due to our disposition of the appeal in this case, Meyer's Cross-Assignment of Error No. 3 need not be considered and is found moot.
Because Meyer failed to offer substantial probative evidence of an element common to both fraud and fraudulent concealment, we shall consider Cross-Assignments of Error Nos. 1 and 2 together.
We shall assume for the purpose of determining the disposition of these cross-assignments on appeal that a jury question existed as to whether BOC knowingly or recklessly made a false representation, by words or conduct, of the length of its commitment to Meyer and/or BOC knowingly concealed the fact that it planned to terminate Meyer's contract as a distributor within a relatively short period of time. The dispositive issue is, however, Meyer's alleged reliance stemming from the representations and/or concealment.
A critical element of both fraud and fraudulent concealment is not simply reliance on a material misrepresentation, seeRuss v. TRW, Inc. (1991), 59 Ohio St.3d 42, 49 (fraud) or material concealment, see Gaines v. Preterm-Cleveland, Inc.
(1987), 33 Ohio St.3d 54, 55. Instead, the reliance must be justifiable, Russ v. TRW, Inc., 59 Ohio St.3d at 49
(fraud), or done with a right to do so, Gaines v.Preterm-Cleveland, Inc., 33 Ohio St.3d at 55 (fraudulent concealment). In light of BOC's subsequent refusal to modify the 1980 Authorized Dealer's Agreement, the entering into of the oximeter contract containing the same termination clause, and the actions taken by BOC with regards to its distributors in 1984-1985, reasonable minds could only conclude that Meyer could not justify its reliance on any oral promise or conduct representing long term commitment to the business relationship. Furthermore, even in viewing these facts in a light most favorable to Meyer, reasonable minds could only conclude that Meyer had no right to so rely. Thus, Meyer's fraud and fraudulent concealment claims fail for the same reason its promissory estoppel claim fails. Smolinv. Orra (Mar. 31, 1994), Lucas App. No. L-93-163, unreported, quoting Wing v. Anchor Media, Ltd. of Texas (1991), 59 Ohio St.3d 108,111, modified on other grounds in Dresher v. Burt (1996),75 Ohio St.3d 280. Consequently, the trial court did not err in granting BOC's motion for a directed verdict on Meyer's fraud and fraudulent concealment claims. Meyer's Assignments of Error Nos. 1 and 2 are found not well-taken.
In summary, the trial court erred in failing to grant BOC's motions for a directed verdict and/or judgment notwithstanding a verdict on Meyer's promissory estoppel claim and breach of the oximeter contract claim. The court did not err in granting BOC's motion for a directed verdict on Meyer's fraud and fraudulent concealment claims. Based on these conclusions, the judgment of the Erie County Court of Common Pleas awarding Meyer $2.9 million must be reversed. The foregoing finding renders any question as to the denial of BOC's motion for a new trial and, in the alternative, request for remittitur moot. Likewise, the denial of Meyer's motion for prejudgment interest and merger are rendered moot. This cause is remanded to the trial court with an order to dismiss this case, with prejudice. O.E. Meyer Company is ordered to pay the costs of this appeal.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 __________________________________________ PETER M. HANDWORK, J., JUDGE.
 __________________________________________ MELVIN L. RESNICK, J., JUDGE.
 __________________________________________ RICHARD W. KNEPPER, P.J., JUDGE CONCUR.
[1] These defendants were individuals that were members of BOC management during the pertinent time period. They are included in the use of "BOC" as denoting appellants/cross-appellees.
[2] We are of the opinion that these were the actual bases of Meyer's claim. However, Meyer failed to offer substantial proof on the elements of these theories. A written contract may be orally amended if the oral amendment has the essential elements of a binding contract. Carrocce v. Shaffer (Oct. 31, 1997), Trumbull App. No. 96-T-5521, unreported, following RichlandBuilders, Inc. v. Thome (1950), 88 Ohio App. 520, 527. Essential to the formation of an enforceable contract are the elements of a meeting of the minds, an offer, and acceptance. Noroski v.Fallet (1982), 2 Ohio St.3d 77, 79. The parties must have a "distinct and common intention which is communicated by each party to the other." McCarthy, Lebit, Crystal Haiman Co. L.P.A. v.First Union Mgt., Inc. (1993), 87 Ohio App.3d 613, 620. The fact that BOC rejected Meyer's offer to change the termination provision in the Authorized Dealer's Contract evinces a failure to have a distinct and common intention to agree to a "long term commitment." Waiver is a voluntary relinquishment of a known right. State ex rel. Ryan v. State Teachers Retirement Sys.
(1994), 71 Ohio St.3d 362, 368. Even if BOC made an oral promise of "long term commitment" or engaged in conduct from which such a promise could be inferred, it expressly refused to relinquish a right to terminate Meyer without cause upon the giving of a thirty day prior notice. Furthermore, Paragraph 19 of the Authorized Dealer's Agreement expressly requires that any modification or waiver be written and signed.
[3] These assignments of error are:
 "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING BOC'S MOTION FOR A NEW TRIAL.
 "IN THE ALTERNATIVE, THE TRIAL COURT ERRED IN DENYING REMITTITUR AND THIS COURT SHOULD ENTER AN ORDER REDUCING THE DAMAGE AWARD UNDER THIS COURT'S AUTHORITY TO ORDER REMITTITUR."