In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-2453

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID WEIMERT,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:14-cr-00022-jdp-1 — **James D. Peterson**, *Judge.*

ARGUED JANUARY 22, 2016 — DECIDED APRIL 8, 2016

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In the midst of the 2008–09 financial crisis, a Wisconsin bank called AnchorBank was struggling to stay above water. Under pressure to find cash to pay its own lenders, the bank's president told vice president David Weimert to try to sell the bank's share in a commercial real estate development in Texas. Weimert, who is the defendant

and appellant in this criminal wire fraud case, successfully ar-
ranged a sale that exceeded the bank's target price by about
one third. The deal also relieved the bank of a liability of twice
the sale price.

Given the version of the facts we must accept for this ap-
peal, however, Weimert saw an opportunity to insert himself
into the deal personally. He persuaded two potential buyers
that he would be a useful partner for them. Both buyers in-
cluded in their offer letters a term having Weimert buy a mi-
nority interest in the property. The bank agreed. It also agreed
to pay Weimert an unusual bonus to enable him to buy the
minority interest. We must also assume that the successful
buyer, at least, would have been willing to go forward with-
out Weimert as a partner, and that Weimert deliberately mis-
led his board and bank officials to believe that the successful
buyer would not close the deal if he were not included as a
minority partner. The government prosecuted Weimert for
wire fraud on the theory that his actions added up to a scheme
to obtain money or property by fraud, and the jury convicted
him on five of six counts of wire fraud under 18 U.S.C. § 1343.

We reverse and order judgment of acquittal. Federal wire
fraud is an expansive tool, but as best we can tell, no previous
case at the appellate level has treated as criminal a person's
lack of candor about the negotiating positions of parties to a
business deal. In commercial negotiations, it is not unusual
for parties to conceal from others their true goals, values, pri-
orities, or reserve prices in a proposed transaction. When we
look closely at the evidence, the only ways in which Weimert
misled anyone concerned such negotiating positions. He led
the successful buyer to believe the seller wanted him to have

a piece of the deal. He led the seller to believe the buyer insisted he have a piece of the deal. All the actual terms of the deal, however, were fully disclosed and subject to negotiation. There is no evidence that Weimert misled anyone about any material facts or about promises of future actions. While one can understand the bank's later decision to fire Weimert when the deception about negotiating positions came to light, his actions did not add up to federal wire fraud. Weimert is entitled to judgment of acquittal. We order his prompt release from federal prison, on the stated terms of supervised release in his sentence, pending issuance of our mandate.

I.   *The Standard of Review*

We review *de novo* the denial of a motion for judgment of acquittal. *United States v. Durham*, 766 F.3d 672, 678 (7th Cir. 2014), citing *United States v. Claybrooks*, 729 F.3d 699, 704 (7th Cir. 2013). We construe the evidence in the light most favorable to the government, asking whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Durham*, 766 F.3d at 678, quoting *United States v. Love*, 706 F.3d 832, 837 (7th Cir. 2013).

Given our deference to jury determinations on evidentiary matters, we rarely reverse a conviction for mail or wire fraud due to insufficient evidence. See *United States v. Mullins*, 800 F.3d 866, 870 (7th Cir. 2015) ("Sufficiency challenges are very difficult to win … ."). We have sometimes said that such appeals face "a nearly insurmountable hurdle." E.g., *United States v. Domnenko*, 763 F.3d 768, 772 (7th Cir. 2014), quoting *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014). The hurdle is not actually insurmountable, though. See, e.g., *Durham*, 766 F.3d at 678–79 (reversing on two counts); *United States v. Dooley*, 578 F.3d 582, 588–89 (7th Cir. 2009) (reversing

on one count); see also *United States v. Lake*, 472 F.3d 1247, 1260
(10th Cir. 2007); *United States v. Izydore*, 167 F.3d 213, 220 (5th
Cir. 1999); *United States v. Goodman*, 984 F.2d 235, 239–40 (8th
Cir. 1993). Even more to the point, the Supreme Court has re-
versed mail and wire fraud convictions that would have dra-
matically expanded the scope of the statutes. *Skilling v. United
States*, 561 U.S. 358, 413–15 (2010) (affirming the reversal of
honest-services wire fraud conviction); *Cleveland v. United
States*, 531 U.S. 12, 26–27 (2000) (reversing wire fraud convic-
tion for failure to demonstrate loss of property); *McNally v.
United States*, 483 U.S. 350, 360–61 (1987) (reversing wire fraud
conviction on honest services theory of fraud prior to statu-
tory revision). We take a similar step here.

II.  *The Limits of Mail and Wire Fraud*

   A.  *The Breadth of Mail and Wire Fraud*

Before giving a detailed account of the evidence, we ex-
plain the legal standards we apply. The wire fraud statute pro-
hibits schemes to defraud or to obtain money or property by
means of "false or fraudulent pretenses, representations, or
promises" if interstate wire or electronic communications are
used to execute the scheme. 18 U.S.C. § 1343. To convict a per-
son under § 1343, the government must prove that he "(1) was
involved in a scheme to defraud; (2) had an intent to defraud;
and (3) used the wires in furtherance of that scheme." *United
States v. Faruki*, 803 F.3d 847, 852 (7th Cir. 2015), quoting
*Durham*, 766 F.3d at 678.

To prove a scheme to defraud, the government must show
that Weimert made a material false statement, misrepresenta-
tion, or promise, or concealed a material fact. *United States v.
Powell*, 576 F.3d 482, 490 (7th Cir. 2009); see also *Neder v. United*

*States*, 527 U.S. 1, 25 (1999) (holding "materiality of falsehood" is an element of federal mail and wire fraud statutes). Intent to defraud requires proof that the defendant acted willfully "with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *Faruki*, 803 F.3d at 853, quoting *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010).

Like its cousin mail fraud, the wire fraud statute has been interpreted to reach a broad range of activity. Courts have taken an expansive approach to what counts as a material misrepresentation or concealment in a scheme to defraud. As we will see, it is possible to put together broad language from courts' opinions on several different points so as to stretch the reach of the mail and wire fraud statutes far beyond where they should go.

First, for example, materiality has been defined in broad and general terms as having a tendency to influence or to be capable of influencing the decision-maker. *Neder*, 527 U.S. at 16; *United States v. Seidling*, 737 F.3d 1155, 1160 (7th Cir. 2013).

Second, the concept of a misrepresentation is also broad, reaching not only false statements of fact but also misleading half-truths and knowingly false promises. *Powell*, 576 F.3d at 490–91; *United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007), citing *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005); see generally *Durland v. United States*, 161 U.S. 306, 312 (1896) (mail fraud not limited to common law fraud but includes "representations as to past or present, or suggestions and promises as to the future"). It can also include the omission or concealment of material information, even absent an affirmative duty to disclose, if the omission was intended to induce a false belief and action to the advantage of the schemer and the

disadvantage of the victim. *United States v. Morris*, 80 F.3d 1151, 1160–61 (7th Cir. 1996), quoting *Emery v. American General Finance, Inc.*, 71 F.3d 1343, 1346 (7th Cir. 1995); see also *United States v. Keplinger*, 776 F.2d 678, 697–98 (7th Cir. 1985).

Third, wire fraud does not require the false statement to be made directly to the victim of the scheme. Deception of someone else can suffice if it carries out the scheme. *Seidling*, 737 F.3d at 1160.

Fourth, it is no defense that the intended victim of wire fraud was too trusting and gullible or, on the other hand, was too smart or sophisticated to be taken in by the deception. *United States v. Coffman*, 94 F.3d 330, 333 (7th Cir. 1996); see also *United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright.") (citation omitted).

These and other expansive glosses on the mail and wire fraud statutes have led to their liberal use by federal prosecutors. As one future federal judge put it during his tenure as a prosecutor, these statutes are "our Stradivarius, our Colt 45, our Louisville Slugger, our Cuisinart—and our true love." Jed S. Rakoff, *The Federal Mail Fraud Statute (Part I)*, 18 Duq. L. Rev. 771, 771 (1980). Mail and wire fraud statutes "have long provided prosecutors with a means by which to salvage a modest, but dubious, victory from investigations that essentially proved unfruitful." John C. Coffee, Jr. & Charles K. Whitehead, *The Federalization of Fraud: Mail and Wire Fraud Statutes*, in White Collar Crime: Business and Regulatory Offenses § 9.05, at 9-73 (1990).

The mail and wire fraud statutes have "been invoked to impose criminal penalties upon a staggeringly broad swath of behavior," creating uncertainty in business negotiations and challenges to due process and federalism. *Sorich v. United States*, 555 U.S. 1204, 129 S. Ct. 1308, 1308–11 (2009) (Scalia, J., dissenting from denial of certiorari on scope of "honest services" theory of fraud). We must take care not to stretch the long arms of the fraud statutes too far. See *Pasquantino v. United States*, 544 U.S. 349, 377 (2005) (Ginsburg, J., dissenting) (Supreme Court has "also recognized that incautious reading of the statute could dramatically expand the reach of federal criminal law, and we have refused to apply the proscription exorbitantly").

B. *Fraud and Commercial Negotiations*

This case presents a test of how far the mail and wire fraud statutes reach when parties negotiate a substantial commercial transaction that involves, as almost all will, the use of the mails or interstate wire communications. Some deceptions in commercial negotiations certainly can support a mail or wire fraud prosecution. A party may not misrepresent material facts about an asset during a negotiation to sell it. For example, a seller or his agent may not falsely tell potential buyers or investors that a piece of property has no history of environmental problems if soil and groundwater contamination on the property was discovered the year before. The buyer would be led to purchase a property worth far less than she was led to believe, given the looming remediation costs. Similarly, a company may not inform a potential investor that it expects patent protection for its key intellectual property if its patent application was recently rejected as barred by prior art. The

investor would be led to believe that he was investing in a valuable asset that was actually worthless. The misrepresentations materially alter one party's understanding of the subject of the deal.

In prior cases, we have also said that a company may not hide behind disclaimers while deliberately understating expected losses in disclosures to investors. The information would be material to the price buyers of securities are willing to pay. *United States v. Morris*, 80 F.3d 1151, 1167–68 (7th Cir. 1996). Nor may a company choose to advertise the success of one investor in isolation while omitting the crippling losses of ninety percent of its investors. *United States v. Biesiadecki*, 933 F.2d 539, 541–43 (7th Cir. 1991). Nor may a party falsify loan documents to defraud mortgage lenders, *United States v. Sheneman*, 682 F.3d 623, 629 (7th Cir. 2012), forge a buyer's signature on a check, *United States v. Powell*, 576 F.3d 482, 491 (7th Cir. 2009), or use false advertising to guarantee investors impossible returns, *United States v. Sloan*, 492 F.3d 884, 890–91 (7th Cir. 2007). In short, the federal mail and wire fraud statutes reach a seller's or buyer's deliberate misrepresentation of facts or false promises that are likely to affect the decisions of a party on the other side of the deal.

These practices deviate far from behavioral norms for business transactions in a market economy governed by the rule of law. There are more difficult cases, however. "Not all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud.'" *United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) (alteration omitted), quoting *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989) (affirming summary judgment and sanctions for defendants in civil RICO case alleging failure to disclose

information that home lots were not suitable for building). The mail and wire fraud statutes "do not cover all behavior which strays from the ideal." *United States v. Colton*, 231 F.3d at 901 (citation and internal quotation marks omitted). We have also explained that a corporate officer's breach of fiduciary duty, when combined with a mailing or wire communication, is not sufficient to show mail or wire fraud. *United States v. Kwiat*, 817 F.2d 440, 444 (7th Cir. 1987) (reversing convictions). And "we do not imply that all or even most instances of non-disclosure of information that someone might find relevant come within the purview" of the mail and wire fraud statutes. *United States v. Keplinger*, 776 F.2d 678, 697–98 (7th Cir. 1985) (affirming mail fraud convictions for scheme to submit false laboratory results on safety of medications).

C. *Fraud and Negotiating Positions*

As shown below, the central issue in this case is whether the mail and wire fraud statutes can be stretched to criminalize deception about a party's negotiating positions, such as a party's bottom-line reserve price or how important a particular non-price term is. We conclude that they cannot.

From strands of case law, it is true, one can piece together a mail or wire fraud case based on such deception about negotiating positions. To track the specific rules we discussed above: First, information about a party's negotiating position is surely material in the sense that it is capable of influencing another party's decisions. Second, actionable deception can include false statements of fact, misleading half-truths, deceptive omissions, and false promises of future action. All of these descriptions may fit deceptions about negotiating positions, at least if a negotiator's present state of mind is treated as a fact. Third, the false statement may be made to someone

other than the owner or holder of the money or property targeted by the scheme. And fourth, it is no defense that the intended victim either trusted the defendant too much or was too savvy to be fooled.

But Congress could not have meant to criminalize deceptive misstatements or omissions about a buyer's or seller's negotiating positions. See *United States v. Coffman*, 94 F.3d 330, 334 (7th Cir. 1996) ("it would not do to criminalize business conduct that is customary rather than exceptional and is relatively harmless"). Buyers and sellers negotiate prices and other terms. To state the obvious, they will often try to mislead the other party about the prices and terms they are willing to accept. Such deceptions are not criminal.

To take a simple example based on price, suppose a seller is willing to accept $28,000 for a new car listed for sale at $32,000. A buyer is actually willing to pay $32,000, but he first offers $28,000. When that offer is rejected and the seller demands $32,000, the buyer responds: "I won't pay more than $29,000." The seller replies: "I'll take $31,000 but not a penny less." After another round of offers and demands, each one falsely labeled "my final offer," the parties ultimately agree on a price of $30,000. Each side has gained from deliberately false misrepresentations about its negotiating position. Each has affected the other side's decisions. If the transaction involves interstate wires, has each committed wire fraud, each defrauding the other of $2,000? Of course not. But *why* not?

The government's answer at oral argument was the absence of "intent to defraud." That answer begs the question. How do we recognize "intent to defraud" if a party has gained a better deal by misleading the other party about its

negotiating position? If a party's negotiation position is mate-
rial for purposes of the mail and wire fraud statutes, each has
obtained a financial gain by deliberately misleading the
other.[1]

The better answer is that negotiating parties, and certainly
the sophisticated businessmen in this case, do not expect com-
plete candor about negotiating positions, as distinct from
facts and promises of future behavior. Deception about nego-
tiating positions—about reserve prices and other terms and
their relative importance—should not be considered material
for purposes of mail and wire fraud statutes.

Even after receiving the government's post-argument sup-
plemental authority, we know of no other case in which a
court has found that deceptive statements about negotiating
positions amounted to a scheme to defraud under the mail or
wire fraud statutes. This absence is consistent with more gen-
eral understandings in the law.

In the Restatement (Second) of Torts treatment of fraud,
for example, statements about a party's opinions, preferences,
priorities, and bottom lines are generally not considered state-
ments of fact material to the transaction. See Restatement
(Second) of Torts § 538A cmts. b, g (distinguishing between
representations of facts—where the maker has definite
knowledge—and opinions—including a "maker's judgment
as to quality, value, authenticity or similar matters as to which

---

[1] One might raise a practical objection to this simple example: it will
usually be too difficult to prove that a negotiating position was deliber-
ately deceptive in such a two-person negotiation over a car. But in much
larger business deals involving negotiating teams, internal emails and dis-
cussions would routinely provide such evidence if one were to look.

opinions may be expected to differ"). Rules of professional
conduct for attorneys require honesty in dealing with others,
but they draw a similar line on negotiation positions. See
Model R. Prof. Conduct 4.1(a) cmt. 2 ("Under generally ac-
cepted conventions in negotiations, certain types of state-
ments ordinarily are not taken as statements of material fact.
Estimates of price or value placed on the subject of a transac-
tion and a party's intentions as to an acceptable settlement of
a claim are ordinarily in this category … ."); see also G. Rich-
ard Shell, *When Is It Legal to Lie in Negotiations?*, 32 Sloan Man-
agement Rev. 93, 96 (1991) ("There are thus no legal problems
with lying about how much you might be willing to pay or
which of several issues in a negotiation you value more
highly. Demands and reservation prices are not, as a matter of
law, material to a deal.").

To show how these general considerations govern this
case, we lay out in Part III the sequence of negotiations in this
sale. Then, in Part IV, we work through the more detailed legal
analysis of the government's case against Weimert, including
the issues posed by Weimert's status as a corporate officer of
one party to the deal, acting under a disclosed conflict of in-
terest. We recount the facts in the light reasonably most favor-
able to the government. The question to keep in mind is
whether the facts here go beyond misstatements or omissions
about negotiating positions or are otherwise sufficient to sup-
port the wire fraud convictions.

III. *The Sale*

A.  *AnchorBank, Its Affiliates, and the Crisis of 2008–09*

This case stems from a bank's attempts in late 2008 and early 2009 to sell its interest in a commercial real estate development. The bank was actually several companies, with a publicly traded holding company, Anchor BanCorp Wisconsin, Inc. ("ABCW"), at the top. ABCW owned both AnchorBank, fsb, a federal savings bank, and a non-bank subsidiary called Investment Directions, Inc., or "IDI," which invested in real estate.

The boards and officers of the three companies interlocked. Defendant David Weimert was both a vice president of AnchorBank and the president of IDI. As IDI president, Weimert identified investment opportunities and managed development projects. In that capacity, he reported to the IDI board of directors, which had to approve any sales or purchases.

The financial crisis of 2008 put AnchorBank and ABCW in a difficult financial position. They were trying to negotiate extensions on a $116 million loan from U.S. Bank, with a sizable payment due on March 31, 2009. By late December 2008, the holding company realized it would have a difficult time avoiding default. Adding to the pressure, federal bank regulators had told AnchorBank that its balance sheet was so shaky that it could not send a cash dividend to the parent holding company to help with the payment to U.S. Bank.

B.  *The Push to Sell Chandler Creek*

One possible source of cash for the holding company was to have IDI sell assets and transfer the cash to the parent holding company to help with the loan payment. On December 29,

2008, Mark Timmerman, president of the bank, told Weimert to try to sell IDI's 50 percent interest in a Texas commercial real estate development known as Chandler Creek. Timmerman told Weimert he wanted to sell IDI's interest for no less than the book value of its investment, about $6 million.

Weimert faced a big challenge. Witnesses testified uniformly that in the first quarter of 2009, the market for selling commercial real estate was just terrible. Adding to the challenge, IDI owned only 50 percent of Chandler Creek. The other 50 percent was owned by The Burke Real Estate Group, which was the general partner, meaning it had management control of the property. The Burke Group also had a right of first refusal if IDI tried to sell to anyone else. In addition, IDI and The Burke Group were each liable for the full $15 million mortgage on the property, and IDI had to carry the full $15 million as a liability on its books. Adding even more to the challenge, Timmerman wanted Weimert to sell the property in time to obtain cash for the March 31 payment to U.S. Bank.

Weimert had already tried twice in 2008 to sell the IDI interest to The Burke Group. Those overtures had been rebuffed. After receiving Timmerman's December 29 email, Weimert tried again, treating the sale as an urgent matter for the whole AnchorBank enterprise. In early January 2009, he put together a written investor proposal for IDI's Chandler Creek interest and circulated it to potential buyers. The proposal estimated that IDI's 50 percent interest was worth approximately $16.8 million but said that IDI was willing to accept $9 million. Weimert's efforts to find a buyer in January were not successful, though. Time was running out.

C. *Weimert Secures Two Offers to Buy Chandler Creek*

On January 27, 2009, Weimert went back to Brian Burke of The Burke Group in hopes of arranging a sale. Burke was still not interested, but he was shaken when he saw Weimert's investor proposal. Realizing that IDI might sell to a stranger who would then become his partner, he continued talking with Weimert. The two sketched some possible terms of a transaction. Giving the government the benefit of Burke's confused and inconsistent testimony on the point, we assume that Weimert suggested in this meeting that he buy about five percent of IDI's 50 percent share and that The Burke Group buy the other 45 percent.

While the Burkes considered the proposal, Weimert also contacted another potential buyer, Nachum Kalka, with whom Weimert had done deals before. Despite The Burke Group's right of first refusal, he was interested in making a deal. Kalka's interest could also help Weimert and IDI push The Burke Group to make an offer without further delay. Because of The Burke Group's right of first refusal and the possibility that a bid by Kalka would help IDI even if The Burke Group bought the property, Weimert and Kalka discussed having IDI agree to pay Kalka a break-up fee to compensate him for his trouble if IDI sold to someone else. Kalka received the proposal and Chandler Creek's financial statements from Weimert and forwarded the information to his investment partner.

In the second half of February, events moved quickly. About February 16, Weimert asked Richard Petershack, an outside lawyer for IDI, to draft a proposed "template" letter of intent for potential buyers of the Chandler Creek interest. Petershack testified that Weimert told him to use $8.5 million

as the purchase price, with financing of $6.5 million available through AnchorBank. Weimert also told Petershack to include a term that Weimert said buyers were requiring: that Weimert himself "stay in the deal because of my institutional knowledge of the project." Petershack also testified that Weimert told him that IDI had agreed to compensate him for his efforts in "facilitating the deal and finding potential investors" by paying him a fee of four percent of the purchase price. On this record, we must assume that Weimert was lying to Petershack at that time about the buyers requiring that he participate and IDI agreeing to the four percent fee.

Petershack prepared the template letter of intent as instructed. He sent copies to Weimert and to Kalka, and also to AnchorBank president Timmerman. By sending the draft to Timmerman, Petershack sought to confirm authority for Weimert's participation in the deal and the fee. He also wanted to inform Timmerman of Kalka's role as a "stalking horse" to push the Burkes to make an offer. Petershack received no word back from Kalka or Timmerman on the substance of the letter of intent, either generally or on Weimert's involvement in particular.

Two days later, on February 18, Weimert had dinner in California with Brian Burke and his father and business partner, William Burke. Weimert gave them a copy of the template letter of intent. He told them of Kalka's interest as a competing buyer. To Weimert's frustration, though, the Burkes were not yet willing to make a formal offer, at least until another buyer had made an offer.

On February 22, 2009, Weimert called Kalka and his investment partner. Both Weimert and the partner agreed that

Weimert's involvement as a buyer would be beneficial; Weimert knew the property and had worked with the Burkes for several years. (Kalka's testimony was unclear as to whether his partner or Weimert first proposed that Weimert participate as a buyer.) In a follow-up email to Weimert, Kalka later confirmed "it is imperative that you David Weimert be involved personally in the Chandler Creek transaction." Weimert's involvement needed to be "economic" to assure Kalka of Weimert's services in overseeing the investment. Kalka wrote that Weimert "might show this," presumably the email, "to your Board to make sure that this is happening."

The following day, February 23, Weimert sent the IDI board of directors a memorandum on the Chandler Creek negotiations. He summarized key points from his conversations with Kalka and his partner. Kalka was to serve as a "stalking horse" in the investment and had ample funds to make the investment. In exchange, Kalka would receive $75,000 as a break-up fee if his offer was not selected. Finally, Weimert added: "It is imperative that Mr. Weimert be involved economically to assure his management—and investment liaison involvement in perpetuity while Mr. Kalka and or his investors are involved." Weimert went on to note as a "bottom line … [that] Kalka will not do this without me being a Manager of the Investment and Liaison to his Group and the Burke's … ." As best we can tell from the record, this statement to the board about Kalka and his partner was true.

Turning to The Burke Group as a possible buyer, Weimert told the board that the Burkes' participation was still possible, with the Burkes signaling in preliminary discussions that "they also desire my involvement both economically … and my 10 year contribution toward the successful direction of

this Project." (Note the difference at this stage between what Kalka "required" and what the Burkes "desired.") Weimert suggested that, to have sufficient funds to buy his share, he would require a fee of at least three percent of the purchase price and an additional one percent to help him pay off an outstanding note to AnchorBank.

About the same time, attorney Petershack sent Weimert a revised template letter of intent, which Weimert forwarded to Kalka on February 24. The revised template listed Weimert as buying a four and seven-eighths percent ownership of Chandler Creek and included the four percent fee for Weimert. Later that day, Kalka submitted a signed version of the letter of intent offering $8.5 million for the property. On February 25, Weimert forwarded the Kalka offer to The Burke Group. He explained that the IDI board would meet soon and encouraged the Burkes to make an offer. The Burke Group quickly responded by sending its signed letter of intent to Weimert, but it offered only $8 million.

D.  *The IDI Board Approves and Sells to The Burke Group*

By late February 2009, then, Weimert had secured two offers that exceeded Timmerman's target price for Chandler Creek by at least $2 million. But both offers also posed what all IDI directors and other bank officials recognized as a conflict of interest: Weimert was both a buyer and an officer of the seller. Weimert submitted both letters of intent to the IDI board of directors along with two memoranda that were central to the government's case.[2]

---

[2] Strictly speaking, neither letter of intent was a firm offer. Both were subject to various contingencies, and the letters were drafted to require

The first, called "A Personal Note," was a short summary of the evolution of the deal. Weimert wrote falsely that he had "had no intention of being involved in this Project." But the deal had evolved, he said, so that "The Kalka's Group required [Weimert's involvement], … and Bill Burke actually felt that [Weimert] would continue to 'Add a Positive Dimension' to the Management of Chandler Creek." In addition to describing his involvement falsely as "inadvertent," Weimert said he needed to participate to close the deal.

Weimert's second document, called "Evolution of This Deal," also reported on his negotiations with Kalka and the Burkes. As part of the Kalka offer, Kalka had "insisted" that Weimert "run this investment" and "have money in the deal so 'I don't run away.'" As for the Burkes, Weimert falsely told the board that they continued to "be especially focused on my continued involvement." Weimert concluded by recommending selling to The Burke Group. Although it was offering a lower purchase price, the Burke deal would also release IDI from its potential $15 million liability to Bank of America on the Chandler Creek mortgage.

The IDI board convened on February 27, 2009 to consider the sale of Chandler Creek. At the board meeting, Weimert presented each offer to the board and recommended a sale to The Burke Group. He also told the board that his participation in the deal was necessary. The directors found this proposal unusual, to say the least. In light of the conflict of interest that

---

further negotiations on details, even after execution, before either side would be bound to the terms of the proposed transaction. See, e.g., *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.*, 873 F.2d 155, 158 (7th Cir. 1989) (holding that executed draft letter of intent imposed only a limited duty to negotiate in good faith).

everyone recognized, the board excused Weimert from the meeting while it discussed the conflict issue with outside counsel.

The attorney advised the board that Weimert's involvement was not illegal. He asked the board two questions: first, whether the transaction could be completed without Weimert's involvement; and second, whether the transaction was necessary and in the best interest of the company. The board members said they understood that Weimert "had to be involved or the Burkes were not going to be a purchaser," and that the deal was good for the company, especially with the need to raise cash to make the looming payment due to U.S. Bank at the end of March. The attorney advised the board to waive the conflict and go forward with the sale. On this advice, the board waived the conflict, accepted The Burke Group's purchase offer, and approved the four percent fee for Weimert in the amount of $311,000.

According to David Omanchinski, a member of the AnchorBank board of directors, Weimert had also told him at about the time of the IDI board meeting that "he did not believe the deal could get done without his participation in it," and that Weimert would not have received his fee or any additional compensation if it had not been tied to The Burke Group deal.

The final terms of the deal were rather different from the terms proposed in the letter of intent and approved by the IDI board. IDI's attorney worked on the revisions. There is no evidence that Weimert had anything further to do with IDI's side of the transaction. On behalf of IDI, the attorney actually removed Weimert's participation from the purchase agreement

itself. He reasoned that Weimert's purchase was a matter between him and The Burke Group and was more appropriate for a side deal between them than as part of the primary transaction. The attorney also drafted the separate agreement for Weimert's ownership, requiring Weimert to commit that he would in fact make the promised investment. In exchange for the four and seven-eighths percent ownership interest, Weimert would contribute $100,000 to his partnership with The Burke Group.

On March 30, IDI and The Burke Group closed the deal, in the nick of time for IDI to send the cash from the sale to the parent holding company, ABCW, which then used it to pay U.S. Bank on March 31. The Burke Group bought IDI's 50 percent stake of Chandler Creek for $7,792,000 and relieved IDI of its mortgage obligation. The purchase was financed with a $6,233,000 loan from AnchorBank. IDI also paid Kalka the agreed $75,000 break-up fee. And Weimert received his agreed fee and bought a share of Chandler Creek from The Burke Group.

E.  *Weimert's SEC Testimony and the Prosecution*

At this point, one might think, all parties were satisfied with the deal. The Burke Group got a good deal and owned more than 95 percent of the Chandler Creek property. The bank had sold the property for nearly $2 million more than it was willing to accept. It had also managed to move millions of dollars upstream to ABCW so that it could make its payment to U.S. Bank. And Weimert was hundreds of thousands of dollars ahead, with cash and a fractional interest in Chandler Creek.

Then the Securities and Exchange Commission investi-
gated AnchorBank and its affiliates' use of TARP funds. The
investigation included the Chandler Creek deal, which could
be viewed as an indirect mechanism to channel AnchorBank's
TARP money through the loan to The Burke Group to IDI and
then on to ABCW.

In April 2012, Weimert gave testimony before the SEC re-
garding the deal. He testified that the Burkes had not *insisted*
on his involvement, but that instead he had told the Burkes he
would "like to be part of the transaction." Weimert said he
had felt he "was the broker in the transaction and deserved a
piece of the transaction." Weimert further testified that he was
"an earmark to the deal," a description he claims he used to
alert the IDI board that he "wanted to make sure that they
understood that I wasn't absolutely necessary for this deal."
All IDI directors testified at Weimert's trial, though, that Wei-
mert had not described his role as an "earmark" but had told
them instead that his participation was required by the
Burkes.[3]

In February 2014, a few weeks before the five-year statute
of limitations would have run, a federal grand jury indicted
Weimert on six counts of wire fraud. The indictment alleged
a scheme to defraud IDI through materially false and fraudu-
lent pretenses to obtain an ownership interest in IDI's share of
Chandler Creek and to receive the four percent fee. Specific

---

[3] Anchor BanCorp Wisconsin, Inc. filed for Chapter 11 bankruptcy
protection on August 12, 2013. The approved bankruptcy reorganization
plan allowed ABCW to escape almost all of its TARP loan obligations and
to reduce its obligations to U.S. Bank. See *In re Anchor BanCorp Wisconsin
Inc.*, No. 3:13-BK-14003 (Bankr. W.D. Wis. 2013).

misrepresentations included Weimert's affirmative state-
ments that the Burkes required his involvement and his de-
ception about who first proposed that he have a piece of the
deal. Weimert pled not guilty. At trial, the jury convicted Wei-
mert on five of the six counts. The district court denied Wei-
mert's Rule 29 motion for judgment of acquittal. The court
sentenced Weimert to 18 months in prison, well below the ad-
visory guideline range of 87–108 months, and also ordered
three years of supervised release, a $25,000 fine, $322,515 in
restitution, and the relinquishment of his interest in Chandler
Creek. Weimert has appealed.

IV. *Analysis*

To reiterate, we review *de novo* the denial of a motion for
judgment of acquittal, *United States v. Durham*, 766 F.3d 672,
678 (7th Cir. 2014), citing *United States v. Claybrooks*, 729 F.3d
699, 704 (7th Cir. 2013), construing the evidence in the light
most favorable to the government, *Durham*, 766 F.3d at 678,
quoting *United States v. Love*, 706 F.3d 832, 837 (7th Cir. 2013).

Even under this deferential standard of review, Weimert is
entitled to a judgment of acquittal. All terms of the transac-
tion, including Weimert's participation as a buyer, were dis-
closed to all interested parties. The government's evidence of
deception—all of it—addressed not material facts or promises
but rather parties' negotiating positions, which are not mate-
rial for purposes of mail and wire fraud. In Part A, below, we
first explain the government's theory. In Part B, we conclude
that Weimert did not commit a crime by anything he told the
potential buyers. We address in Part C Weimert's deception of

the IDI board and in Part D whether his role as a corporate officer can support the convictions. [4]

A. *The Government's Theory*

The government's theory is that Weimert obtained property (the fee and the share of Chandler Creek) by deceiving the IDI board and his ABCW/AnchorBank supervisors, as well as Petershack, Kalka, and the Burkes. The government's case relied on Weimert's direct communications with the IDI bank executives and directors, and on a third-party theory of fraud based on deceiving the buyers rather than IDI, from whom he actually obtained property. See *United States v. Seidling*, 737 F.3d 1155, 1160–61 (7th Cir. 2013). The government argued that Weimert committed wire fraud by telling Petershack about the need for his participation and fee, by failing to disclose to Kalka that he was a stalking-horse bidder, by misrepresenting Kalka's involvement to the Burkes, and by repeatedly telling the IDI board and bank officials that he had not originated the idea of participating as a buyer and that the buyers required that he participate in the deal.

B. *Deception of the Buyers*

We first address the government's theory that Weimert committed wire fraud by misleading Kalka about whether his bid, which was not successful, was a "stalking horse" bid. "Stalking horse" is not a legal term of art, and it was never

---

[4] We reject the government's forfeiture argument. At the close of the government's case-in-chief, Weimert moved for judgment of acquittal, arguing that the government had failed to establish the element of materiality. The court reserved ruling. Weimert renewed the motion in writing at the end of the trial. The materiality issue was not forfeited.

defined precisely in the trial. The term is often used in bank-
ruptcy proceedings to describe an initial bid for assets invited
by the debtor to set a floor for competing bids. See, e.g.,
*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. —,
132 S. Ct. 2065, 2069 (2012). In that context there is nothing
even suspicious about the practice.

In this case, however, the government seems to use the
term to describe a bidder who does not actually mean to fol-
low through on the bid, but whose bid is being used by the
seller to trick another potential bidder to make or increase a
bid. This theory of fraud fails on the evidence, so we need not
evaluate its legal viability.

There is no evidence that Kalka's bid was anything other
than a good-faith bid. Kalka and his partner offered a higher
price. They hoped to win the purchase, and they had the as-
sets to close the deal. Kalka knew Weimert was hoping to elicit
another bid, or at least that his offer would have to be subject
to The Burke Group's right of first refusal. That's why the
$75,000 break-up fee made sense. But there simply is no evi-
dence that there was anything fraudulent about Kalka's bid or
role. We need not consider the legal question whether a com-
plete bluff to the Burkes about the Kalka bid might support a
wire fraud conviction, though bluffs in negotiations are not
unusual.

The government also argued that Weimert misled the
Burkes. First, the government pointed to the contradiction in
Weimert telling the Burkes on one hand that Kalka would be
a terrible partner for the Burkes—thus encouraging the
Burkes to make their own offer—but telling them on the other
hand that Kalka would be an attractive partner. This theory
cannot support a conviction for wire fraud. In the negotiating

dance, Weimert was trying to coax the Burkes to make a serious and prompt offer to buy IDI's share of Chandler Creek. The inconsistent opinions he expressed to reluctant bidders about how well they would like having Kalka and his investor as partners in the investment did not rise beyond puffery. They cannot reasonably be deemed material. See *United States v. Coffman*, 94 F.3d 330, 334 (7th Cir. 1996) (noting in wire fraud case that nearly "all sellers engage in a certain amount of puffing; all buyers … know this; it would not do to criminalize business conduct that is customary rather than exceptional").

Second, the government argued that Weimert misled the Burkes about whether Kalka was requiring Weimert to participate in the deal. That led the Burkes to include in their letter of intent a term having Weimert buy a minority stake in Chandler Creek. Although Kalka was in fact requiring Weimert's participation, any deception of the Burkes on that score would not have been material because it was deception of the opposing party in a transaction about the negotiating positions of third parties.

C.  *Weimert's Deception of the IDI Board*

The government relies most heavily on the theory that Weimert deceived the IDI board and its affiliates about whether The Burke Group required his participation in the purchase. According to the government, Weimert crafted an elaborate scheme to obtain money and property by leading IDI to believe the buyers insisted on his participation and by leading the buyers to believe that IDI wanted him to participate. On this record, giving the benefit of conflicting evidence to the government, we must assume that he did so, and that he did so by deceiving the various parties about the negotiations with other parties. He told Kalka and Petershack that IDI

supported his involvement in the deal and that Timmerman had approved. He told the Burkes that IDI and Kalka all wanted him in the deal. And he told the IDI board that the Burkes required his participation. The deception was especially plausible in early 2009, when many owners were trying to sell shaky real estate investments. A seller who was willing to keep some "skin in the game" had more credibility than a seller who was trying to walk away from the property entirely.

To the extent the Chandler Creek deal is properly understood as an arms-length, three-party deal, with IDI selling most of its interest to The Burke Group and a fraction to Weimert, these deceptions do not support the criminal convictions. They misled parties who were negotiating a commercial deal only about the negotiating positions—the preferences, values, and priorities—of other parties.

IDI was not misled as to the nature of the asset it was selling or the consideration it received. Cf. *United States v. Sheneman*, 682 F.3d 623, 629 (7th Cir. 2012) (lenders induced by falsified loan documents); *United States v. Morris*, 80 F.3d 1151, 1167–68 (7th Cir. 1996) (investors induced by misleading sales tactics at pricing). And IDI was not misled as to Weimert's interest in seeing the deal done. Cf. *United States v. George*, 477 F.2d 513–14 (7th Cir. 1973) (employee received hidden kickbacks that caused employer to overpay for assets).

At bottom, even the centerpiece of the government's case—Weimert falsely told the IDI board and Omanchinski that the Burkes required his participation—amounted to no more and no less than a false prediction about how the Burkes would respond to a counteroffer to exclude Weimert's partic-

ipation. In other words, it was deception about a party's negotiating position. Weimert's false story about who had first come up with the idea to have him participate would have been material only for what it signaled about how important his participation was to the parties. In other words, it was important only in predicting how various parties were likely to respond to a counteroffer proposing to reduce or eliminate his role. For the reasons explained above in Part II, such deceptions about parties' preferences and values, and thus their negotiating positions, are not material for purposes of wire fraud and cannot support Weimert's convictions.

D.  *Weimert's Role as Fiduciary*

But is it correct to consider the Chandler Creek deal as an arms-length transaction among three separate parties? After all, Weimert was an officer of IDI. He owed the corporation fiduciary duties of loyalty and honesty. The government's strongest argument is that Weimert's actions amounted to a scheme to defraud IDI because, even if an outsider might be permitted to mislead it about negotiating positions, Weimert could not do so about his own role in the transaction. Based on the testimony of IDI directors, we must assume that they trusted Weimert on all aspects of the Chandler Creek deal, including what he told them about the buyer insisting that he participate in the deal.

In light of the disclosure of all terms of the sale, as well as our doubts that an officer or other fiduciary must disclose his negotiating position when dealing with the company about his own compensation, we think the better approach is to treat this as closer to an arms-length transaction, at least for purposes of criminal law.

One cornerstone of civil corporation law is that corporate officers and directors owe fiduciary duties of loyalty and honesty to the corporation. E.g., *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) (when directors are on both sides of transaction, they must demonstrate "their utmost good faith and the most scrupulous inherent fairness of the bargain"); *Racine v. Weisflog*, 477 N.W.2d 326, 329 (Wis. App. 1991) (officers and directors are under fiduciary duty of individual loyalty, good faith, and fair dealings in corporate business). The questions here involve whether Weimert breached his fiduciary duty to IDI and how such a breach of a civil duty affects the analysis under the law of criminal wire fraud.

Proof of a breach of fiduciary duty is neither necessary to nor sufficient proof of mail or wire fraud, but such a breach is often relevant. First, while the "existence of a [fiduciary] duty is relevant and an ingredient in some" wire fraud prosecutions, it is not essential to establish wire fraud. *United States v. Colton*, 231 F.3d 890, 900–01 (4th Cir. 2000) (quotation marks omitted); see also *United States v. Keplinger*, 776 F.2d 678, 697–98 (7th Cir. 1985) (citations omitted). Concealment is often accompanied by a violation of a fiduciary duty, but it need not be.

More pertinent for this case, a breach of fiduciary duty combined with a mailing or wire communication is insufficient alone to establish mail or wire fraud. *United States v. Kwiat*, 817 F.2d 440, 444 (7th Cir. 1987) (reversing mail fraud conviction of corporate officer through scheme for self-dealing: "Neither the language nor the legislative history of § 1341 hints that it is an all-purpose remedy for corporate mismanagement."); *Disher v. Information Resources, Inc.*, 691 F. Supp.

75, 86 (N.D. Ill. 1988) ("Not every common law breach of fiduciary duty that involves mailings or use of the telephone constitutes a violation of the mail and wire fraud statutes."), *aff'd*, 873 F.2d 136 (7th Cir. 1989). The government must still demonstrate a scheme to defraud, including "some sort of fraudulent misrepresentation or omissions calculated to deceive persons of ordinary prudence and comprehension." *Disher*, 691 F. Supp. at 86, quoting *United States v. Wellman*, 830 F.2d 1453, 1462 (7th Cir. 1987); see also *United States v. Feldman*, 711 F.2d 758, 763 (7th Cir. 1983) ("Yet not every breach of duty by an employee works as a criminal fraud … . Such activities must be accompanied by a scheme formed with the intent *to defraud*.") (emphasis in original) (citations omitted).

In some cases, such as "honest services" mail and wire fraud cases that rely on 18 U.S.C. § 1346, a breach of a fiduciary duty may lie at the core of the offense, such as when an officer or director receives a hidden kickback or bribe from a party transacting business with his company. That is clear from *Skilling v. United States*, 561 U.S. 358, 405–09 (2010), where the Supreme Court held that an "honest services" fraud prosecution requires proof of a kickback or bribe. At the same time, the *Skilling* Court also rejected the government's argument that self-dealing alone, *even undisclosed self-dealing*, would violate fraud statutes without a kickback or bribe. *Id*. at 409–11. Also important for our thinking in this case, the Court emphasized that uncertainty in criminal law weighed in favor of lenity. *Id*. at 410–11. For other illustrations of the bribe-kickback point, see, e.g., *United States v. Nayak*, 769 F.3d 978, 980–81 (7th Cir. 2014) (affirming mail fraud conviction of doctor who paid bribes and kickbacks to encourage other doctors to refer their patients); *United States v. Vrdolyak*, 593 F.3d

676, 678 (7th Cir. 2010) (explaining guilty plea based on hidden kickback from buyer to seller's director).

There was no such hidden kickback or bribe here. Nor was there even undisclosed self-dealing. Weimert's interest in the Chandler Creek sale was fully disclosed to the IDI board. Everyone recognized the conflict of interest, and they took the appropriate steps to deal with it as a corporation should when an officer or director has a material, personal interest in a transaction with the corporation. See Del. Code Ann. tit. 8, § 144; *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del. 2006). Weimert did not participate in the board's decision to approve the sale. The board received independent advice from counsel about the conflict and the transaction before approving it. And there is no evidence that Weimert played any role in the later negotiations needed to close the sale to The Burke Group on somewhat modified terms, for a lower price.

Since Weimert had such a substantial financial interest in the deal that was disclosed to the board, it is helpful to view the role of Weimert's fiduciary duty as if this were a transaction involving Weimert's own compensation. If Weimert's role as a corporate officer with fiduciary duties were to play a decisive role here, it would be because he would have owed a duty to the corporation to be completely honest regarding the Chandler Creek sale, including how his participation in the deal came about and what he knew about how the Burkes were likely to have responded to a counteroffer excluding Weimert. So, to the extent that fiduciary standards are relevant to this criminal case, the best guidance concerns the extent of a corporate officer's fiduciary duty toward the corporation in negotiating his own compensation.

When a corporate officer is negotiating his own compensation with the corporation, the scope of that fiduciary duty appears to be a matter of controversy and divided authority. Courts often use sweeping language to describe that duty. See, e.g., *Nixon*, 626 A.2d at 1376 (directors on both sides of transaction must demonstrate "their utmost good faith and the most scrupulous inherent fairness of the bargain"); see also *Maksym v. Loesch*, 937 F.2d 1237, 1242 (7th Cir. 1991) (when attorney agrees with client to side-deal benefitting the attorney, "the burden of proof is upon the attorney to show the fairness of the agreement, the utmost good faith, complete disclosure on his part and a full understanding of all the facts and legal consequences on the part of the client").

Taken literally, such a broad fiduciary duty could require a corporate officer negotiating with the corporation about his own compensation to reveal the weaknesses in his own negotiating position as part of his duty of good faith. He might be required, for example, to disclose that he would be willing to take less compensation than he is asking for. And under that reasoning, Weimert would have been obliged to tell the directors that the Burkes probably would have been willing to go forward with the purchase even without his participation. That is not the law with corporate fiduciary duties or with other fiduciary duties, however, or at the very least it is not so clearly the law as to support a criminal conviction.

For example, Delaware courts teach that "an officer may negotiate his or her own employment agreement as long as the process involves negotiations performed in an adversarial and arms-length manner." *In re Walt Disney Co. Derivative Litigation*, 825 A.2d 275, 290 (Del. Ch. 2003) (emphasis omitted)

(denying motion to dismiss), *later judgment for defendants aff'd*, 906 A.2d 27 (Del. 2006).

Similarly, a Texas court applying Delaware law has explained that when a corporate officer negotiates and renews his own employment terms, he "acts in his individual capacity, as it is evident that the company and the employee are adverse to each other in the context of negotiating that employee's compensation." *Pride International, Inc. v. Bragg*, 259 S.W.3d 839, 850 (Tex. App. 2008), citing *In re Walt Disney*, 906 A.2d at 49–51. As another example of controversy on the civil side of the fiduciary duty issue, see *Fernandez v. City of Miami*, 147 So.3d 553 (Fla. App. 2014), where a majority held that a city attorney breached his fiduciary duty in negotiating a generous severance term in his own employment contract with the city, while the dissenting judge argued that the relationship was not a fiduciary one when negotiating compensation. *Id*. at 564–65 (Shepherd, C.J., dissenting), citing *Pride Int'l*, 259 S.W.3d at 850, and *In re Walt Disney*, 906 A.2d at 49–51.

In the related area of an attorney's fiduciary duties to clients, we have cautioned that the broader scope of fiduciary duty quoted above does not apply with full force when the attorney's compensation is the issue: "Fiduciary law does not send the dark cloud of presumptive impropriety over the contract that establishes the fiduciary relationship in the first place and fixes the terms of compensation for it." *Maksym*, 937 F.2d at 1242. We continued: "Most fiduciary relationships are established by contract and are not eleemosynary, yet the contracts establishing them are held valid without the court's imposing on the lawyer or other fiduciary the difficult burden of demonstrating that he made full disclosure of the terms of the contract and that those terms were 'fair,' whatever exactly that

means." *Id*. Thus, while an attorney's fiduciary duty is broad, the law does not require an attorney negotiating with a client over a fee to disclose the lowest fee the attorney would be willing to accept. That remains a matter for negotiation without a duty of complete disclosure of the attorney's negotiating position.

Along these lines, it is also useful to recall a legal dispute in the appellate courts at the time of the events at issue in this case. The dispute concerned the fiduciary duty imposed by statute, § 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a–35(b), with respect to compensation advisors receive from mutual funds. In 2008, a panel of this court held that agreed-upon compensation was lawful, without subjecting the rates to judicial review for reasonableness. *Jones v. Harris Associates L.P.*, 527 F.3d 627, 632–33 (7th Cir. 2008). By way of illustration, we explained that corporate officers' fiduciary duties did not "prevent them from demanding substantial compensation and bargaining hard to get it." *Id*. at 632. Bargaining "hard" can include bluffs about negotiating positions. Showing the room for controversy, rehearing en banc was denied by an equally divided court, 537 F.3d 728 (7th Cir. 2008), and then, after the events in this case, the Supreme Court reversed, adopting a standard that allows for judicial review of the reasonableness of such fees charged by mutual fund fiduciaries. *Jones v. Harris Associates L.P.*, 559 U.S. 335 (2010).

Our point here is not to resolve whether or not the government proved a civil breach of fiduciary duty by Weimert in the Chandler Creek sale. The concerns raised by our dissenting colleague about the duties, incentives, and sometimes conflicting interests of corporate officers and directors are im-

portant, have considerable force, and deserve further consideration as a part of the civil law governing those relationships. Our point is a narrower one: that at the time relevant in this case, civil corporate law standards of fiduciary duty did not provide a clear answer for a situation like this: a corporate officer negotiating with his employer in a three-sided deal in which he, his employer, and a third party took part, in which his personal financial interest was known, but in which he misled that employer about his and others' negotiating positions on the transaction. Perhaps IDI and AnchorBank would have had a viable civil case against Weimert, or perhaps not. But particularly in light of the rule of lenity invoked in *Skilling*, 561 U.S. at 410–11, we do not believe the government has proven criminal wire fraud in the circumstances of this unusual, and seemingly unprecedented, prosecution. This is not a case where a party used a secret side-deal to induce a victim to part with an asset at a discount. The final contract terms were in plain view and were in fact discussed and negotiated by the interested parties. We leave the civil law issues and remedies for civil cases.

V. *Conclusion*

Federal mail and wire fraud statutes encompass a broad range of behavior. Their limits can be difficult to draw with certainty. But there are limits nonetheless, and they must be defined by more than just prosecutorial discretion. Deception and misdirection about a party's values, priorities, preferences, and reserve prices are common in negotiation. We must be wary of criminalizing these tactics, at least without much clearer direction from Congress. Weimert's dealings in selling Chandler Creek were sharp and self-interested, but they did not amount to wire fraud. By the time IDI signed the contract

to sell, all terms of the deal were on the table. IDI might have been able to secure a better deal if it had known the underlying priorities of prospective buyers and Weimert, but that is for now, at least, a matter for the corporate boardroom and civil law, not a federal criminal trial.

Weimert's motion for a judgment of acquittal should have been granted. Accordingly, we need not reach the other issues Weimert raises on appeal. The judgment of the district court is REVERSED. We order Weimert released from Bureau of Prisons custody within 72 hours of issuance of this opinion, subject to the terms of supervised release of his sentence, pending issuance of our mandate. Pending issuance of our mandate, the district court shall have jurisdiction to modify and enforce those terms of supervised release as appropriate.

FLAUM, *Circuit Judge*, dissenting.

I respectfully disagree with the analysis and conclusion of the majority. At the outset, I do not believe that the scenario presented in this case can be viewed as an arms-length, three-party transaction. Weimert, as president of IDI, was acting on behalf of IDI in negotiating the deal. Unlike a situation involving three independent parties, in the transaction at hand, the IDI board had every reason to expect that Weimert would fairly and honestly represent its interests. The record does not reflect an expectation at the start of negotiations that Weimert would be entitled to equity or any sort of bonus arising out of the Chandler Creek deal. Thus, I cannot accept the majority's conclusion that this situation amounts to hard bargaining among disinterested parties, and that the IDI board received what it agreed to and expected in the Chandler Creek sale. In fact, IDI likely would have received a higher purchase price had Weimert not taken a bite out of the deal. IDI received roughly 96 percent, rather than 100 percent, of the purchase price due to Weimert's creation of equity for himself.

I also do not agree that this case is similar to a routine negotiation among buyers and sellers in which the parties benefit from deliberately false misrepresentations about their negotiating positions. Such situations, which the majority contends are customary and relatively harmless, entail actual arms-length transactions among independent parties. By contrast, Weimert, the president of IDI, was not at arms-length with the IDI board. Moreover, in the typical negotiation involving a buyer and seller, the parties are aware that they are solely bargaining with one another; in the case at hand, the IDI board had no reason to believe that it was also negotiating with Weimert, in addition to the potential buyers.

Although the final contract terms were disclosed when the IDI board considered and approved the deal, the evidence suggests that the IDI board only approved the deal because Weimert represented that it would not get done without his involvement. All of the board members later testified that they would not have voted to waive the conflict of interest and pay Weimert's fee if they had known that the Burkes did not require his involvement. This evidence undermines the notion that the IDI board simply agreed to the terms that were in plain view and received what it expected. Rather, the deal the board approved was based on misrepresentations by its own representative and the board would not have approved the deal if it had known the truth. Further, I find the majority's assertion that the final contract terms were "in fact discussed and negotiated by the interested parties" to be an incomplete portrayal of the facts, since the only parties to negotiate the letter of intent that the IDI board approved were Weimert, as IDI's representative, and the Burkes. Although the final contract terms were slightly different than those initially approved by the board, that letter of intent formed the basis for a transaction in which the parties assumed and ultimately mandated Weimert's participation.

If one focuses on Weimert's misrepresentations to the IDI board while he was supposedly acting on its behalf, the materiality inquiry is different than the majority proffers. Even if Weimert's statements to Kalka and the Burkes—parties at arms-length—were closer to puffery, Weimert's deception of the IDI board and his ABCW/AnchorBank supervisors was more insidious than mere bluffing. Furthermore, even assuming Weimert's participation was a non-core term of the deal, IDI was misled as to the amount it could receive for the property as well as Weimert's interest in seeing the deal completed.

Weimert's misrepresentations induced the IDI board to ap-
prove the deal and were, therefore, material to the board's de-
cision. *See Neder v. United States*, 527 U.S. 1, 16 (1999).

Our case law also supports the conclusion that Weimert's
misrepresentations to the Burkes were material to the IDI
board's decision to approve the deal. *See United States v. Seid-
ling*, 737 F.3d 1155, 1160 (7th Cir. 2013) (noting that "[i]n gen-
eral, a false statement is material if it has a natural tendency
to influence or [is] capable of influencing, the decision of the
decisionmaking body to which it was addressed" (quoting
*Neder*, 527 U.S. at 16) (internal quotation marks omitted)). As
mentioned previously, all of the board members testified that
they would not have voted to waive the conflict of interest and
pay Weimert's fee if they had known that the Burkes did not
require his involvement. Weimert's statements were also ma-
terial to his supervisors at AnchorBank, who testified that
they would not have approved payment of his fee through
bank payroll if it had not been their understanding that Wei-
mert had to be involved in the deal.

In sum, I conclude that Weimert committed wire fraud by
deceiving his own company and taking a portion of the deal
for himself. I am not unsympathetic to the majority's commen-
tary regarding the "expansive glosses" on the mail and wire
fraud statutes that have led to their liberal use by federal pros-
ecutors, but Weimert's deception of his own board meets the
Supreme Court's standard for materiality. *Neder*, 527 U.S. at
16.

Additionally, even if one assumes that Weimert's misrep-
resentations to the Burkes and Kalka did not, standing alone,
rise to the level of criminal wire fraud, they do constitute such
when combined with his statements to the IDI board. In

*United States v. Seidling*, we held that wire fraud does not require that the false statement be made directly to the victim of the scheme—here, the IDI board. 737 F.3d at 1160. *Seidling* involved a misrepresentation to a third party that furthered the scheme to defraud the victim. *Id.* As in *Seidling*, Weimert's misrepresentations to the Burkes and Kalka were integral to the success of his scheme to defraud IDI. Thus, no matter how insignificant these misrepresentations may have been to the Burkes and Kalka, I conclude that they still satisfy the requisite materiality element of wire fraud and support Weimert's conviction.

Beyond whether this is properly viewed as an arms-length, three-party transaction, I am further concerned with the majority's fiduciary duty analysis. The parties did not address the issue of fiduciary duty and, in any event, it is not central to the criminal wire fraud analysis. *See United States v. Kwiat*, 817 F.2d 440, 444 (7th Cir. 1987). What is critical is Weimert's position of trust as IDI's president.

I also find questionable the majority's framing of Weimert's misrepresentations as a permissible employment compensation negotiating strategy. I do not view this as a situation in which Weimert, who had not been promised any sort of compensation arising out of the sale of Chandler Creek, was negotiating the terms of his employment at arms-length with the IDI board. Instead, Weimert was simultaneously representing and deceiving the IDI board for his own pecuniary gain.

For the foregoing reasons, I respectfully dissent and would affirm the judgment of conviction.